# United States Court of Appeals
## For the First Circuit

Nos. 22-1064
     23-1100

SAVANNAH KINZER, individually and on behalf of all others
similarly situated; HALEY EVANS, individually and on behalf of
all others similarly situated; CHRISTOPHER MICHNO, individually
and on behalf of all others similarly situated,

Plaintiffs, Appellants,

SUVERINO FRITH, individually and on behalf of all others
similarly situated; CEDRICK JUAREZ, individually and on behalf
of all others similarly situated; FAITH WALSH, individually and
on behalf of all others similarly situated; MACKENZIE SHANAHAN,
individually and on behalf of all others similarly situated;
COREY SAMUEL, individually and on behalf of all others similarly
situated; ABDULAI BARRY, individually and on behalf of all
others similarly situated; LINDSAY VUONG, individually and on
behalf of all others similarly situated; SAMANTHA BERIMBAU,
individually and on behalf of all others similarly situated;
CAMILLE TUCKER-TOLBERT, individually and on behalf of all others
similarly situated; ANA BELEN DEL RIO-RAMIREZ, individually and
on behalf of all others similarly situated; LYLAH STYLES,
individually and on behalf of all others similarly situated;
KAYLA GREENE, individually and on behalf of all others similarly
situated; SHARIE ROBINSON, individually and on behalf of all
others similarly situated; JENNIFER OSAYANDE, individually and
on behalf of all others similarly situated; BRITNEY IFEBOHR,
individually and on behalf of all others similarly situated;
KANAYA RYLAND, individually and on behalf of all others
similarly situated; KIRBY BURT, individually and on behalf of
all others similarly situated; LEAVER MICHEL, individually and
on behalf of all others similarly situated; SUEPRIYA ADHI,
individually and on behalf of all others similarly situated;
ALICE TISME, individually and on behalf of all others similarly
situated; CHARLES THOMPSON, individually and on behalf of all
others similarly situated; CASSIDY VISCO, individually and on
behalf of all others similarly situated; KELLY RIGLER,
individually and on behalf of all others similarly situated;
JUSTINE O'NEILL, individually and on behalf of all others
similarly situated; SARITA WILSON, individually and on behalf of

all others similarly situated; YURIN LONDON, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

WHOLE FOODS MARKET, INC.,

Defendant, Appellee.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

———————

Before

Kayatta, Lipez, and Thompson,
Circuit Judges.

———————

Shannon Liss-Riordan, with whom Matthew Carrieri and Lichten
& Liss-Riordan, P.C., were on brief, for appellants.
Michael L. Banks, with whom Andrew M. Buttaro, Terry D.
Johnson, and Morgan, Lewis & Bockius LLP, were on brief, for
appellee.
David P. Boehm, Attorney, National Labor Relations Board,
with whom Jennifer A. Abruzzo, General Counsel, Nancy E. Kessler
Platt, Associate General Counsel, Dawn L. Goldstein, Acting Deputy
Associate General Counsel, Polly Misra, Supervising Attorney, and
Madeline Corkett, Attorney, were on brief for the National Labor
Relations Board, amicus curiae.

———————

April 24, 2024

———————

**LIPEZ**, **Circuit Judge**.  In the summer of 2020, amid pandemic mask mandates and nationwide racial justice protests, Whole Foods Market, Inc. ("Whole Foods") began disciplining employees who wore facemasks to work supporting the Black Lives Matter movement, citing its dress code.  Suspecting Whole Foods of discrimination for singling out the pro-Black message, the three plaintiff-appellants ("the Employees") persisted in wearing these masks, among taking other actions, until the company terminated them, ostensibly for repeated violations of the dress code or attendance policy.  The Employees sued under Title VII, alleging retaliation.  Determining that no reasonable factfinder could conclude that Whole Foods' stated reasons for firing the Employees concealed retaliatory animus, the district court granted Whole Foods' motion for summary judgment against all three.  We hold that summary judgment was improper against one of the Employees, Savannah Kinzer, an outspoken critic of the company whose termination arguably deviated from Whole Foods' disciplinary process, but we affirm the court's holding as to both Haley Evans and Christopher Michno.

The Employees also ask us to review a discovery order compelling the production of communications whose confidentiality they argue is protected by the National Labor Relations Act.  We decline to reach the merits of that issue, however.

**I.**

Our review of a district court's summary judgment decision is de novo. Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013). Our task is to determine whether the movant is "entitled to judgment as a matter of law" because "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A genuine dispute is one which "a reasonable jury could resolve . . . in the favor of the non-moving party," and a material issue is one with the "potential to affect the outcome . . . under the applicable law." Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

Our analysis "look[s] to all of the record materials on file, including the pleadings, depositions, and affidavits," without evaluating "the credibility of witnesses nor weigh[ing] the evidence." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). "[W]e recite the facts in the light most favorable to the non-moving party," drawing all reasonable inferences in the Employees' favor. Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015). The "test for summary judgment is steeped in reality," however, and thus the Employees cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation." Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st

Cir. 2018) (quoting <u>Medina-Munoz</u> v. <u>R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)).

We also presume some familiarity with our decision in <u>Frith</u> v. <u>Whole Foods Mkt., Inc.</u>, 38 F.4th 263 (1st Cir. 2022), in which we affirmed the dismissal of certain Title VII retaliation and discrimination claims challenging Whole Foods' enforcement of its dress code against Black Lives Matter masks.

## A.  Factual Background

This case arises from the convergence of two historic events unfolding in the summer of 2020: the COVID-19 pandemic, which made it necessary to wear facemasks in public, and widespread racial justice protests sparked by the murder of George Floyd.  In June of 2020, Whole Foods workers at stores across the country began wearing masks to work bearing the slogan "Black Lives Matter" ("BLM").  Management reprimanded these employees, citing the company's dress code.  The events underlying this appeal followed, as the Employees resisted the prohibition of BLM masks and allege that Whole Foods fired them in retaliation for their efforts.

### 1.  Whole Foods' Dress Code and Disciplinary Process

Whole Foods employs a "corrective action process" to manage employee relations, a system of progressive discipline consisting of verbal and written reprimands as employees commit disciplinary infractions.  Generally, the termination of an employee is preceded by a succession of formal "corrective

actions," including a verbal warning, one or more written warnings, and a "final written warning."[1] Excessive tardiness or absenteeism and dress code violations are infractions subject to this process.

Whole Foods' dress code prohibits apparel displaying messages or brands not affiliated with the company. In April of 2020, when it first mandated that employees wear masks, Whole Foods clarified that masks must be without "any visible slogan, message, logo or advertising." After seeing an uptick in dress code violations related to BLM masks, Whole Foods reiterated the policy to store managers, reminding them to enforce the dress code consistently against all noncompliance.

At that time, the company also encouraged its stores to handle dress code violations through the company's time and attendance policy. Under this approach, store managers instructed employees who arrived to work in noncompliance with the dress code to correct the issue or go home, after giving the employee a reasonable time to reflect on the decision. Employees choosing to go home would be deemed absent, and employees who came into compliance would be subject to no formal discipline. Employees who remained at work in continued defiance of the dress code -- if

---

[1] Certain serious disciplinary infractions warrant immediate termination or escalation to a final written warning. For instance, an employee who fails to show up for a scheduled shift without calling in the absence (a "No Call/No Show") can be terminated immediately or placed on final written warning, at the store manager's discretion.

permitted to do so -- would receive a formal corrective action for a dress code infraction.  Either way, if an employee showed up to work wearing a BLM mask and refused to replace it, they would be subject to progressive disciplinary actions, which, eventually, would lead to termination.

Whole Foods' North Atlantic Region enforces its time and attendance policy using a points-based system.[2]  Employees who arrive late or leave early are "tardy," in Whole Foods' parlance, and receive one point.  Employees who are absent entirely receive two points.  An employee receives a verbal warning upon accruing 5 points within 30 days, a first written warning upon accruing 4 additional points in the ensuing 60 days (or accruing 9 points within any 90-day period), and a final written warning upon accruing 4 additional points within 90 days after that.  Finally, an employee is terminated if they accumulate 4 more points within 90 days of receiving a final written warning.

The tardiness policy contemplates several scenarios in which the company can excuse lateness due to circumstances beyond the employee's control.  First, "Store/Facility Team Leaders may 'forgive' a tardy point . . . for a group if it is apparent that numerous Team Members suffered tardiness due to the same unforeseen circumstances."  Second, "Store/facility leadership may also, at

---

[2] We recount the policy as applied in Savannah Kinzer's region, unless otherwise specified.

their discretion, occasionally allow a Team Member to report late or leave early for good reason, provided there is no consistent pattern of such requests."  And third, there may be "extenuating circumstances that should result in waiving points for a Team Member," and such "exceptions . . . will be examined on a case-by-case basis, after consultation with Regional Team Member Services."  Though the record does not specify what circumstances merit leniency, it suggests that transportation breakdowns, such as train delays or a stolen car, qualify.  Moreover, while the primary decision-making power lies in the hands of store management, some record evidence indicates that resolving uncertainty "needs to be done through regional" management or, at least, regional management is consulted.

### 2. The Plaintiffs

#### i. Savannah Kinzer

Kinzer worked at a Whole Foods store in Cambridge, Massachusetts, in the company's North Atlantic Region, from April 2020 until her termination on July 18, 2020.  In her initial weeks working at Whole Foods, Kinzer observed seemingly lax enforcement of Whole Foods' dress code.  For instance, she saw "[m]any co-workers . . . w[ear] masks with labels and slogans on them" and apparel depicting sports teams, political phrases, or support for the LGBTQ+ community.  Kinzer herself wore a mask with the phrase "Soup is good" without reprimand, and she also wore ripped jeans

and bike shorts, for which she was verbally reprimanded but was not otherwise disciplined.[3]

Kinzer decided to start wearing a BLM mask at work in late June of 2020. She said she did so both to express support for the Black community and to protest Whole Foods' discipline of employees who had worn such masks at other stores. The first time she wore a BLM mask to work, Kinzer's store manager, Scott Duncan, reprimanded her for wearing the mask and instructed her to replace it. When she refused, she was "sen[t] home" and received a point for the resulting early departure. Over the next two weeks, Kinzer repeatedly wore a BLM mask to work, meeting the same disciplinary fate on at least six occasions. As a result, Kinzer received a verbal warning.

Kinzer claimed she persisted in wearing the BLM mask to "protest[] Whole Foods' discipline" of such masks. Kinzer also organized her coworkers to join her efforts. She acquired dozens of masks to distribute to her coworkers and workers at other locations, leading several other employees to be sent home. Kinzer also organized protests outside the store that attracted community members and public officials and received media attention. Many news reports featured photos of Kinzer or identified her as a

---

[3] Several of Kinzer's coworkers, including her direct supervisor, Shealeigh Morgan, also attested to violating the dress code policy or seeing others do so without being punished prior to June of 2020.

leader of the protests.  Outside of work, Kinzer organized a "town hall" with Whole Foods workers from several states and criticized Whole Foods' policy on social media "non-stop."  She also formed a group chat with coworkers to coordinate further protest activity, and she created a crowdfunding resource to offset the lost wages of protesting workers.

Kinzer's activity was well known to Whole Foods' management.  Kinzer presented the regional president, Richard Bonin, a list of demands related to the mask policy, and she later sent him a video of an employee-led protest.  Both Bonin and Kinzer's store manager, Duncan, also acknowledged seeing news coverage of Kinzer, with Duncan identifying Kinzer as part of the "core group" of employees violating the dress code.  The record shows that Bonin and other executives kept tabs on Kinzer, referring to her in internal emails as the "main agitator" and "the activist that has been the self-appointed voice of the group." Kinzer was also the subject of "scuttlebutt" amongst executives, including that she had contacted lawyers, and the executives specifically instructed managers of other locations to turn her away if she showed up to distribute masks.  They also received a complaint from Amazon, Whole Foods' parent company, about Kinzer passing out masks at a protest outside another store.

Though Kinzer mainly accumulated attendance points for wearing a BLM mask, she also received several points unrelated to

her protest that proved critical to her termination. On one occasion, Kinzer was on vacation and forgot to arrange coverage for her scheduled shift. Her absence was deemed a "No Call/No Show," for which Kinzer received a final written warning. That meant that receiving four more attendance points within 90 days would result in termination. Over the ensuing ten days, Kinzer received one point for wearing a BLM mask and two more for tardiness.

On July 18, 2020, Kinzer called her supervisor, Morgan, to report that she would be late because her bicycle tire had been stolen. Though her tardiness would result in Kinzer's fourth and final point, Morgan assured Kinzer that the point should be excused because the circumstances were beyond Kinzer's control. Despite Morgan's advocacy, however, Duncan was disinclined to excuse Kinzer's tardiness and decided to consult with regional management regarding the matter. Morgan reportedly called Duncan's hesitation "ridiculous" and continued to try to persuade him to excuse the point.

Kinzer proceeded to work her shift as normal while the company deliberated her termination. That morning, several executives, including Bonin, Whole Foods' vice president for team member services Barbara Smith, and Whole Foods' executive vice president Christina Minardi, met regarding Kinzer's termination for approximately one hour. The details of this meeting are largely

unknown, though Bonin stated that "it [came] up that [Kinzer] had filed a lawsuit." The executives eventually told Duncan that Kinzer's "point was not to be excused."

In the meantime, Kinzer met with Duncan at least once during her shift. Kinzer informed Duncan of charges that she had filed with the Equal Employment Opportunity Commission ("EEOC") and the National Labor Relations Board ("NLRB"), which she emailed to him.[4] She then returned to work, her fate uncertain. Several hours later, Duncan summoned Kinzer to his office and explained that Whole Foods was terminating her because she had accrued too many disciplinary points.

### ii. Haley Evans

Evans worked at a Whole Foods in Marlton, New Jersey, in the company's Northeast Region, from April 2017 until her termination on August 1, 2020.[5] Sometime during her employment at Whole Foods, Evans complained to management about a racist remark

---

[4] The record contains some inconsistency regarding the number of meetings and the timing of Kinzer's email, and Duncan maintains that he decided to terminate Kinzer before knowing of the charges. Although the record supports either version of events, we must construe the facts in Kinzer's favor. See Harley-Davidson Credit Corp., 807 F.3d at 408. Thus, we accept here that Kinzer informed Duncan of the charges no later than 12:38 PM but was not fired until later that day, and, in any event, Whole Foods executives discussed "that she had filed a lawsuit" when deciding she should be fired.

[5] Evans took about two months of approved leave at the onset of the pandemic, from March 2020 until mid-June.

directed at her from a coworker, who compared her skin color to burnt rolls.  The coworker received a final written warning, which Evans felt was inadequate.

In mid-June 2020, Evans arrived at work with a mask stating "No Justice, No Peace," a slogan used within the Black Lives Matter movement.  Evans was not disciplined, and she subsequently wore the mask to several more shifts without incident.  Around this time, Evans witnessed other store members wearing masks with the logos of sports teams.  Evans also perceived enforcement of the dress code to be lax prior to the pandemic.  For instance, though the dress code prohibited them, she regularly wore leggings and yoga pants, and she had worn non-compliant shirts.

Evans first wore a mask saying "Black Lives Matter" a few weeks later, and she was directed to remove it.  During that conversation, Evans said that an assistant store manager, Nick Polidore, told her that wearing a BLM mask was like wearing a mask saying "f*** you."  When Evans refused to change her mask, she was sent home and marked absent.  That day, Evans reached out to a local news station and was interviewed about the mask incident, and she also described the racist remark about her skin color.  Whole Foods knew of her interview.

The next day, store management met with employees to inform them that their masks could not have non-company-affiliated writing or logos on them.  Evans also observed a "crack down" on

dress code violations, which she believed was driven by Whole Foods' desire to suppress her BLM mask without appearing inconsistent.

Despite the prohibition, Evans wore a BLM mask to every successive shift until her termination around a month later. Each time Evans arrived with a BLM mask, management instructed her to change. When she refused, management sent her home.[6] On July 8, 2020, she received a written warning due to three absences in 30 days, in accordance with regional policy, and she accrued yet another absence that day. Evans received a final written warning on July 25, 2020, meaning she would be terminated with three more absences within 30 days. On July 29, 2020, Evans registered her third such absence, all of which were due to her BLM mask. Evans was advised that she and store management would discuss separation at Evans's next shift. On August 1, 2020, Evans met with the store manager, Carol Kingsmore, who gave Evans her termination notice and separation papers. During this meeting, Evans informed Kingsmore that the day before, July 31, 2020, she had joined the class action lawsuit against Whole Foods as a named plaintiff.[7]

_____

[6] Evans was also marked absent twice for calling out of scheduled shifts. On one such occasion, Evans came in to discuss the policy with a manager, who told her, evidently incorrectly, that she could wear a BLM shirt, but not a mask. This episode reinforced Evans's sense that the dress code was inconsistently enforced.

[7] While the parties dispute whether Evans informed Kingsmore of the lawsuit before or after receiving her separation papers,

In addition to wearing a BLM mask to work, Evans made other efforts to protest Whole Foods' policy. She encouraged other employees to defy the rule, though she was unsuccessful. Evans also tried to organize a protest, which she ultimately decided against staging because her coworkers feared retaliation. Evans also filed a workplace discrimination charge with the EEOC, which she signed on July 24, 2020, though the record does not clarify whether Evans informed Whole Foods of the charge prior to her termination.

### iii. Christopher Michno

Michno worked at a Whole Foods in Berkeley, California, in the company's Northern California Region, from March 2017 until his termination on September 13, 2020. Prior to the summer of 2020, Michno estimated wearing shirts with non-Whole-Foods-affiliated logos and slogans as frequently as "every day to every other day" without reprimand. He also recalled coworkers, including managers, displaying the logos of sports teams with similar frequency.

Michno first wore a BLM mask to work in late June or early July of 2020, explaining he was motivated in part by the reprimand of a Black coworker for displaying a Black Lives Matter sign at his desk. Several of his coworkers also wore BLM masks to

---

Evans agreed in her deposition that she did not inform anyone in the company about the lawsuit prior to that meeting.

protest that coworker's discipline.  Michno wore a BLM mask five or six times over the next two weeks without incident.

On July 16th, however, the store manager, Kelly Fox, instructed Michno to remove his BLM mask, reportedly saying that displaying the phrase "Black Lives Matter" could be as offensive to customers as displaying a Ku Klux Klan symbol.  Michno also received a verbal corrective from two other individuals in store management, and approximately one week later he received a formal written corrective action notice.[8]  On the form confirming receipt of the corrective action, Michno wrote:

> BLACK LIVES MATTER and asking team members to remove their "BLM slogans" is not inclusive of <u>all</u> identities & skin tones.  This is a racist policy & I hold myself accountable to create a safe space in my work environment where we are <u>inclusive</u> and accommodate <u>everyone</u>.  [A]ll lives don't matter until BLACK LIVES MATTER & I plan to continue to strive for an ANTIRACIST work environment [at Whole Foods].

Aside from a short hiatus, Michno persisted in wearing a BLM mask to work every day, continuing to receive corrective actions in line with Whole Foods' progressive disciplinary system.  Michno received a second corrective action notice on September 7, 2020, and on September 9, 2020, Michno received a final written warning.  When signing that warning, Michno wrote:

---

[8] Rather than refusing a compliant mask and going home, Michno completed his shifts in a BLM mask.  Thus, his corrective actions reflect dress code violations, not absences.

> I will continue to wear black lives matter and use my privilege to advocate for my fellow BLACK coworkers who are systematically oppressed and face discrimination in our own workplace for expressing that their lives matter. This is not political or controversial and purely an exclamation of the sacredness of black lives.[9]

Michno continued to wear a BLM mask to work until being terminated on September 13, 2020.

Michno also protested the policy in other ways. On social media, he accused Whole Foods of "covert racism" and "silencing team members," sharing photos of his first corrective action and his BLM mask. He also joined protests outside of the store, carrying a sign that said "Whole Foods is racist." In addition to informing his manager, Fox, that his continued mask wearing was to protest the policy, he also told her he had retained counsel and was considering suing. Michno did not take any official legal action until after being terminated, filing discrimination charges with the EEOC and the NLRB about a week later.

---

[9] In response to Michno's allegation that his coworkers had experienced discrimination, a human resources representative, Jessica Charney, reached out to Michno for more information. Michno explained that he referred to three coworkers who had complained to him about unfair treatment because they were Black, two for being disciplined unfairly and one for losing out on promotions, but Michno would not name the specific individuals. Charney could not confirm these allegations in her subsequent investigation.

**B.  Procedural Background**

In Frith, we considered Title VII claims brought by a putative class of Whole Foods employees alleging that Whole Foods' enforcement of its dress code policy against BLM masks was racially discriminatory.  While we held that the plaintiffs' discrimination theory was "technically viable," 38 F.4th at 273, we affirmed the district court's dismissal of that claim because their allegations failed to show that Whole Foods' enforcement of its dress code was motivated by race rather than the "obvious alternative explanation" that the store wanted to prevent the "mass expression of a controversial message by employees in their stores," id. at 275 (first quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 9 (1st Cir. 2011)).  We also rejected the plaintiffs' theory that Whole Foods' enforcement of the policy was in retaliation for their protests of the BLM mask prohibition, as they had not "set forth plausible allegations differentiating Whole Foods' discipline of the protesting employees from its earlier discipline of employees for violating the dress code."  Id. at 277-78.

We did not consider, however, Kinzer's individual retaliation claim, which had survived Whole Foods' motion to dismiss.  See id. at 269 n.4; see also Frith v. Whole Foods Mkt., Inc., 517 F. Supp. 3d 60, 74-75 (D. Mass. 2021).  After Kinzer's claim survived, the Employees amended their complaint to add Evans's and Michno's retaliation claims.

The parties proceeded to discovery, during which they became embroiled in a dispute over whether Kinzer must produce certain group chat messages between herself and her coworkers. The district court ordered the production of those messages, and that determination became the subject of an interlocutory appeal.[10]

While that appeal was pending, Whole Foods moved for summary judgment against the Employees. The district court granted Whole Foods' motion in its entirety, stating that "there is little evidence in the record to refute Whole Foods' legitimate business explanations for its strict enforcement of its dress code policy" and "no significant probative evidence that Whole Foods' stated reasons for its actions concealed any discriminatory animus based on Plaintiffs' oppositional conduct." Kinzer v. Whole Foods Mkt., Inc., 652 F. Supp. 3d 185, 204 (D. Mass. 2023). The Employees timely noticed their appeal, which we consolidated with the appeal of the discovery order.

## II.

The parties agree that if we affirm summary judgment in favor of Whole Foods, the discovery issue is moot. Accordingly, we begin with the Employees' Title VII claims. After explaining the relevant Title VII principles, we apply them first to Kinzer's retaliation claim before turning to the others.

---

[10] We recite the facts regarding this dispute in Section III.

**A.  Elements of a Title VII Retaliation Claim**

"Title VII expressly forbids not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices." Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72 (1st Cir. 2011).  The statute protects two forms of conduct: (1) participating in a Title VII proceeding; and (2) "oppos[ing] any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).

To prevail on a retaliation claim, the employee "need not prove that the conditions against which [s]he protested actually amounted to a violation of Title VII." Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (alteration in original) (quoting Wimmer v. Suffolk Cnty. Police Dep't, 176 F.3d 125, 134 (2d Cir. 1999)).  Oppositional conduct need only rest on a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Id. (quoting Wimmer, 557 F.3d at 32).[11]

We analyze Title VII retaliation claims under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973).  See Planadeball v. Wyndham Vacation

---

[11] There is no similar reasonableness requirement for participatory conduct, see Wyatt v. City of Bos., 35 F.3d 13, 15 (1st Cir. 1994), though we have not "definitively decide[d] whether a plaintiff must engage in protected [participatory] activity in good faith in order to invoke the protections of Title VII," Ray v. Ropes & Gray LLP, 799 F.3d 99, 111 (1st Cir. 2015).

Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015). First, the plaintiff must establish a prima facie case by demonstrating that (1) the plaintiff engaged in protected conduct, (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity. See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013). From there, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions." Planadeball, 793 F.3d at 175. Finally, "the plaintiff [must] show that the defendant's explanation is a pretext for unlawful retaliation." Id.

    To survive summary judgment, the Employees "need not prove retaliation by a preponderance of the evidence." Id. They need only "raise a genuine issue of fact as to whether retaliation motivated the adverse employment action." Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 50 (1st Cir. 2010) (quotation marks and alteration omitted). Within that standard, however, a reasonable jury must be able to conclude that retaliatory animus was the but-for cause of the adverse action. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).

**B. Kinzer's Retaliation Claim**

    **1. Prima Facie Case**

        **i. Protected Conduct**

    As noted, Title VII protects both formally participating in a Title VII proceeding as well as conduct opposing suspected

workplace discrimination. Velazquez-Ortiz, 657 F.3d at 72. While the statute does not define this latter category, the Supreme Court has construed the opposition clause broadly. See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276-78 (2009). Thus, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity," and that act is protected so long as the conduct would "qualify in the minds of reasonable jurors as 'resistant' or 'antagonistic' to [the unlawful employment practice]." Id. (ellipsis in original) (first emphasis added) (quotation marks and brackets omitted) (citing 2 EEOC Compliance Manual §§ 8-II-B(1), (2) (Mar. 2003)).

Likewise noting that the opposition clause "sweeps . . . broadly," we have identified numerous examples of protected oppositional conduct, including "responding to an employer's inquiries about inappropriate behavior, writing letters protesting an employer's allegedly unlawful actions, or picketing and boycotting an employer." Ray, 799 F.3d at 108 (collecting cases); see also Rodriguez-Vives v. Firefighters Corps of P.R., 743 F.3d 278, 284 (1st Cir. 2014) ("Even employees who complain of discrimination to their employers' customers are protected from retaliation."). Such oppositional conduct need not be verbal, so

long as it "effectively and purposefully communicate[s] [the employee's] opposition." Collazo, 617 F.3d at 47-48.

At the same time, Title VII does not render employers powerless to enforce nondiscriminatory workplace rules, as "[a]n employer remains entitled to loyalty and cooperativeness from employees." Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 230 (1st Cir. 1976). Thus, "an employee's actions may not be protected under Title VII where they are hostile [or] disruptive," Velez v. Janssen Ortho, LLC, 467 F.3d 802, 806 (1st Cir. 2006) (citing Hochstadt, 545 F.2d at 230-31), for an employer retains a "legitimate interest in seeing that its employees perform their work well," Hazel v. U.S. Postmaster Gen., 7 F.3d 1, 4 (1st Cir. 1993) (quoting Hochstadt, 545 F.2d at 233).

Applying these principles, the district court concluded that all of Kinzer's relevant activity, including "protesting outside of the store, continuing to wear the Black Lives Matter masks even after being told not to, complaining to management, [and] speaking to press" was protected. Kinzer, 652 F. Supp. 3d at 200.

On appeal, Whole Foods concedes -- as it must -- that Kinzer engaged in protected participatory conduct by filing her EEOC complaint. See, e.g., Jones v. Walgreen Co., 679 F.3d 9, 21 (1st Cir. 2012). The company appears to dispute, however, that Kinzer engaged in any protected oppositional conduct. We say that

Whole Foods "appears" to take this position because it only does so implicitly, arguing that Kinzer's sole protected act was her EEOC complaint.  Whole Foods' approach is puzzling, considering the district court's express holding that all of Kinzer's relevant conduct (including protesting, persisting in wearing a BLM mask, complaining to management, and speaking to the press) was protected and that Kinzer has strenuously argued the same throughout this litigation, including on appeal.  Because Whole Foods has failed to develop any argument whatsoever explaining why this conduct was unprotected, we deem it to have waived that issue.  See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); United States v. Moran, 393 F.3d 1, 12 (1st Cir. 2004) ("Let us be perfectly clear. There are times when even an appellee who is defending an entirely favorable judgment must either raise an error purportedly committed by the district court or waive it.").

Accordingly, for the purposes of this appeal, we will assume -- as the district court held -- that Kinzer has carried her burden of establishing that all her relevant activity protesting Whole Foods' enforcement of its dress code against BLM masks was protected oppositional conduct.  We add this caveat, however: Our assumption that Kinzer's persistence in wearing a BLM mask to work to protest Whole Foods' prohibition of them was

protected conduct does not endorse her assertion that Whole Foods retaliated against this particular form of oppositional conduct merely by continuing to enforce its dress code.  As we said in Frith, "employers are not required to 'suspend previously planned [conduct] upon discovering that' employees have engaged in oppositional, protected conduct." 38 F.4th at 277 (alteration in original) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)).  Thus, to show that "Whole Foods' continuing enforcement of its dress code policy was caused by their oppositional conduct," the Employees must show that "any retaliatory discipline was distinguishable from the preexisting and ongoing discipline of employees simply for wearing the Black Lives Matter masks."  Id. (emphasis added).  That limitation follows directly from the text of Title VII, which prohibits "discriminat[ion] against" an employee because of protected oppositional activity.  42 U.S.C. § 2000e-3(a).  Plainly enough, an employer does not discriminate against an employee merely by enforcing a rule against her just as it would anyone else, even if she violated the rule to protest it.[12]

_____

[12] For the same reason, we reject the Employees' argument that Whole Foods' enforcement of its dress code amounts to direct evidence of retaliation, which, if true, would make the rest of the burden-shifting analysis unnecessary.  See, e.g., Rossy v. Roche Prods., Inc., 880 F.2d 621, 625 n.2 (1st Cir. 1989) ("The framework of shifting burdens is inapplicable when the plaintiff presents direct proof of discrimination.").

### ii. Adverse Action and Causation

Kinzer has also satisfied the remaining elements of her prima facie case. Kinzer's termination was obviously an adverse action. See, e.g., Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 198 (1st Cir. 2011). As for causation, the timing of Kinzer's termination "alone [is] suffic[ient] to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) (quoting Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007)). All of Kinzer's protected conduct happened within a matter of days and weeks before her termination.[13] See, e.g., id. (finding satisfactory temporal proximity where "[a]ll of the events described here took place within a period of about one year"); Mariani-Colón, 511 F.3d at 224 (three months).

### 2. Whole Foods' Non-discriminatory Justification

With Kinzer having made her prima facie case, the burden shifts to Whole Foods to articulate a nonretaliatory explanation for Kinzer's firing. Planadeball, 793 F.3d at 175. As Whole Foods notes, Kinzer had obtained enough disciplinary points for poor attendance to warrant termination. "Uniform application of a facially neutral policy that proscribes unexcused absences is a

---

[13] Bonin's admission that the executives discussed that "[Kinzer] had filed a lawsuit" before confirming her termination allows a jury to conclude that Whole Foods was aware of Kinzer's participatory conduct when it terminated her.

legitimate, non[retaliatory] reason for termination . . . ."
Miceli v. JetBlue Airways Corp., 914 F.3d 73, 82 (1st Cir. 2019).
Hence, Whole Foods has carried its burden.[14]

### 3. Pretext

At the third step, Kinzer must "point to specific facts
that would demonstrate" to a reasonable jury that Whole Foods'
invocation of Kinzer's accumulation of attendance points was a
"sham or pretext intended to cover up [Whole Foods'] retaliatory
motive." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 26
(1st Cir. 2004). "There is simply 'no mechanical formula'" for
assessing whether an employee has established pretext. Feliciano
de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1,
6 (1st Cir. 2000) (quoting Thomas v. Eastman Kodak Co., 183 F.3d
38, 56 (1st Cir. 1999)). "In evaluating whether summary judgment
was proper, therefore, we must weigh all the circumstantial
evidence of discrimination, including the strength of the
plaintiff's prima facie case and the employer's proffered reasons
for its action, mindful that 'everything depends on individual
facts.'" Id. at 7 (quoting Thomas, 183 F.3d at 56).

---

[14] The Employees argue that Whole Foods fails to carry its
burden by once again asserting that Whole Foods' explanation is,
in fact, an admission that it punished the Employees for protected
activity by enforcing the dress code. Once again, our holding in
Frith forecloses this argument. See 38 F.4th at 277-78.

We previewed in <u>Frith</u> what a successful case of pretext might look like: Kinzer must "differentiat[e] Whole Foods' discipline of" her, "the protesting employee[,] from its earlier discipline of employees for violating the dress code." 38 F.4th at 277-78.  For instance, Kinzer might show that after she "began . . . to protest enforcement of the dress code policy," she "received harsher discipline than would be expected for simply violating the policy."  <u>Id.</u> at 278 n.14.  Kinzer's case for such "distinct treatment," <u>id.</u> at 277, comes down to the anomalous circumstances of the accumulation of her final point in Whole Foods' disciplinary scheme, resulting in the termination of her job.

Recall that Kinzer was late to work because her bicycle tire was stolen.  As discussed, Whole Foods' policy recognizes that tardiness may be excused "for good reason" or due to "extenuating circumstances."  In practice, the record supports the proposition that transportation issues beyond an employee's control, such as a stolen bicycle tire, call for such leniency.  For example, Bonin testified that a car accident or stolen car could be a reason to waive a tardiness point.  Likewise, Morgan stated that a train delay, among other things "not in the team member's control," is a reason to excuse tardiness.  Indeed, Morgan assured Kinzer that she should not get a point, and she advocated

as much to Duncan, reportedly calling his inclination to enforce the point "ridiculous." Kinzer received the point anyway.

We encountered a similar situation in Travers v. Flight Servs. & Systems, Inc., 737 F.3d 144 (1st Cir. 2013). There, when assessing an employer's nonretaliatory justification that "left room for judgment and discretion," we found summary judgment unwarranted because the record allowed a jury to conclude that the employee "might well have been spared . . . but for a desire to get rid of him." Id. at 148. Comparably here, a jury would have several reasons to conclude that Whole Foods chose not to excuse Kinzer's final disciplinary point because, motivated by retaliatory animus, they wanted to get rid of her.

First, "[e]vidence that the employer deviated from its standard procedure or policies in taking an adverse employment action against a plaintiff may be relevant to the pretext inquiry." Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 50 (1st Cir. 2019). Accordingly, in Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 142-43 (1st Cir. 2012), we found relevant evidence showing that an employee's "dismissal deviated from . . . [the] progressive disciplinary program" the employer ordinarily undertook. As described above, a reasonable jury could conclude that Whole Foods deviated from its ordinary criteria and terminated Kinzer because of a disciplinary point that was not warranted. Such a finding would, in and of itself, support Kinzer's argument

that the disciplinary point was pretext obscuring the company's true retaliatory motive.  The fact that Kinzer had already earned <u>some</u> points is not, as Whole Foods suggests, reason to overlook pretext surrounding her final point.  Our caution that "employers are not required to suspend previously planned conduct upon discovering that employees have engaged in oppositional, protected conduct," <u>Frith</u>, 38 F.4th at 277 (quotation marks and alteration omitted), does not, of course, mean that employers may accelerate their disciplinary course due to an employee's protected conduct.

Second, a jury could reasonably be swayed by the testimony of Shealeigh Morgan, Kinzer's supervisor.  In her deposition, Morgan stated that Kinzer's firing "could be retaliation," elaborating that "it might have been a different situation" with "that final point" "if [Kinzer] was a different person . . . for example, if she hadn't had the trouble before with being sent home for wearing the Black Lives Matter mask."  In other words, if "she was a different team member," maybe then "she wouldn't have been given a point."[15]  True, Morgan hedged elsewhere that her suspicion of retaliation was not based on "any factual

---

[15] It is not clear whether Morgan's statement refers only to Kinzer's persistence in wearing a BLM mask or Kinzer's broader course of oppositional conduct.  As Morgan's words could reasonably bear either meaning, we resolve the ambiguity in Kinzer's favor. We nonetheless note that because we assume that Kinzer's mask wearing was protected oppositional conduct, <u>see</u> <u>supra</u>, even read narrowly Morgan's statement would support a reasonable jury's finding of retaliation.

evidence." Nonetheless, in suggesting that Kinzer might not have been fired if she was a different employee who had not protested Whole Foods' prohibition of BLM masks, Morgan speaks as a member of Whole Foods' management structure generally familiar with Kinzer's situation and the company's attendance policy. Thus, the substance of her testimony provides support for a reasonable jury to conclude that Kinzer "might well have been spared" if she was another employee. Travers, 737 F.3d at 148. Instead, Kinzer "received harsher discipline than would be expected" due to her assumed oppositional conduct. Frith, 38 F.4th at 278 n.14.

Third, the jury could find that the behavior of Whole Foods' management towards Kinzer further corroborates Whole Foods' retaliatory animus. Though the district court found that management's intense scrutiny of Kinzer "largely reflects nothing more than personnel's oversight of the matter," Kinzer, 652 F. Supp. 3d at 203 n.13, we do not agree that this is the only conclusion that a rational jury could draw. Kinzer was outspoken and antagonistic towards Whole Foods, fomenting discontent amongst employees and attracting negative attention from the media, the public, and even the parent company. As a result, high-level executives focused on Kinzer as the "activist that has been the self-appointed voice of the group," received regular accounts of her activity, gossiped about her potential to sue, considered her the "main agitator," and sought to bar her from other store

locations.[16]    A subset of these executives met for an hour to discuss Kinzer's termination and exercised final approval over the decision.[17]

Lastly, the timing of Kinzer's termination, "follow[ing] hard on the heels of [Kinzer's] protected activity" lends some support to Kinzer's retaliation theory.  Collazo, 617 F.3d at 50 (quoting Noviello v. City of Bos., 398 F.3d 76, 86 (1st Cir. 2005)).  As we have discussed, Kinzer engaged in a flurry of protected oppositional and participatory activity, all of which occurred just days or weeks prior to her termination.  Indeed, in addition to her persistent mask wearing, organizing, and public criticism of Whole Foods, Kinzer had filed administrative charges of workplace discrimination days before her termination, and Bonin admitted the executives discussed a legal action by Kinzer while deliberating her fate.  In Collazo, we similarly noted that a

---

[16] We do not suggest that the fact of management's attention to Kinzer's activity is evidence of retaliation.  Of course, it is expected that Whole Foods' management would notice Kinzer's agitations, as was likely her goal.  Rather, a reasonable jury could conclude from the record that the executives involved in the decision to fire her were not only aware of her activity but also viewed it unfavorably.

[17] Whole Foods identifies Duncan, for whom the evidence of retaliatory animus is comparatively scant, as the sole decisionmaker behind Kinzer's termination.  While this argument may have force with a jury, it is not the only version of events supported by the record, as Duncan consulted with the executives about the propriety of Kinzer's final point, which they confirmed only after meeting for an hour without Duncan present.

succession of multiple protected acts in the weeks leading up to the adverse action supported the employee's showing of retaliatory animus at the pretext stage.  See 617 F.3d at 50.

In sum, on this record, there is a genuine dispute as to whether Kinzer's final attendance point was imposed pursuant to the normal application of Whole Foods' time and attendance policy within the framework of its progressive disciplinary system, or whether Whole Foods assessed that point and terminated Kinzer because of her protected conduct.  It is the province of a jury to decide such a dispute.  Thus, summary judgment against Kinzer was unwarranted.

## C.  Evans's and Michno's Retaliation Claims

In assessing Evans's and Michno's claims, we proceed directly to pretext, assuming, without deciding, that both employees have established their prima facie case.  See, e.g., Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 459 (1st Cir. 2016) (adopting the same approach).  As for its nonretaliatory justification, Whole Foods claims that it terminated both employees after they exhausted the company's progressive disciplinary process, Evans for absences stemming from her BLM mask and Michno for dress code violations.

Evans and Michno present three arguments in support of their claim that Whole Foods' invocation of its progressive disciplinary process as the basis for their terminations is a

pretext for retaliatory animus.  First, they argue that the timing of events shows retaliatory animus.  All of their protected activity -- primarily, persisting in wearing BLM masks -- occurred within weeks or months of their terminations, and both also performed discrete protected acts that immediately preceded their terminations.  Evans joined the lawsuit against Whole Foods the day before she was fired, and Michno made an internal complaint about witnessing discrimination only a few days before he was fired.

While such timing is sometimes probative of retaliatory animus, see Collazo, 617 F.3d at 50, it "must be considered alongside the rest of the summary judgment record."  Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 510 (1st Cir. 2022).  Here, the timing is not suspicious, as both employees were terminated immediately after they had exhausted Whole Foods' corrective action process, accruing enough disciplinary infractions, under Whole Foods' system, to warrant dismissal.  Whereas with Kinzer there is reason that could cause a factfinder to doubt that Whole Foods assessed her final disciplinary point properly, Evans and Michno have offered no reason to similarly conclude that Whole Foods acted prematurely in firing them according to its ordinary processes.  Accordingly, the mere fact that their terminations also corresponded with protected activity is not cause for alarm.

Second, Evans and Michno argue that the involvement of high-level executives in their terminations suggests pretext, citing <u>Santiago-Ramos</u> v. <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 55 (1st Cir. 2000). In that case, we noted that "discriminatory <u>comments</u> . . . made by the key decisionmaker or those in a position to influence the decisionmaker" may support pretext. <u>Id.</u> (emphasis added). But the mere <u>involvement</u> of executives -- without some reason to believe they harbored retaliatory motive -- does not similarly imply retaliation. Kinzer's case is illustrative of the distinction. In analyzing her retaliation claim, we discussed what the executives involved in her termination said and did that suggested retaliatory motive -- among other things, they closely scrutinized her every move due to her protected activity and regarded her as an "agitator." Those same executives then deliberated on her termination at length and exercised final approval over the decision to fire her. Evans and Michno, however, seem to argue that the mere fact that the executives were involved at all suggests retaliatory animus. A reasonable jury could not infer retaliation from that fact alone.

Evans and Michno also insist that the involvement of Whole Foods executives was suspicious because it was unusual, and "[d]eviation from established policy or practice may be evidence of pretext." <u>Brennan</u> v. <u>GTE Gov't Sys. Corp.</u>, 150 F.3d 21, 29

(1st Cir. 1998).  For instance, the involvement of executive vice president Minardi, who normally does not participate in personnel matters except in "escalated situation[s]," such as a customer complaint, violence, or theft, suggests to Evans and Michno a departure from Whole Foods' ordinary practices.[18]

In Brennan, a higher-up manager broke with company protocol governing employee layoffs by directly interfering with a department head's application of the company's well-established criteria for choosing which employees to lay off.  Id.  As a result, the plaintiff was terminated because he found himself at the bottom of an ad-hoc ranking of employees produced by that manager, rather than according to the merit-and-seniority-based criteria meant to determine layoffs.  Id.  While such a stark break with "standard procedure" is "directly relevant to . . . demonstrating pretext," id., Evans and Michno have made no similar showing.  For one thing, the record is sparse about the nature of Minardi's involvement in Evans's and Michno's terminations -- it is not clear what, if anything, she contributed that made their firings distinct from the ordinary course of events at Whole Foods.  Moreover, Minardi's involvement appears consistent with her involvement in other "escalated situation[s],"

---

[18] Though Evans and Michno also note the involvement of other high-level executives, such as the regional presidents and the company's head of human resources, as suspicious, they point to nothing in the record suggesting their involvement was abnormal.

considering the brewing controversy surrounding Whole Foods' policy towards BLM masks. The record thus does not support that the involvement of higher-ups like Minardi was a break with past practice suggesting retaliation.

Finally, Evans and Michno argue that they have established pretext by pointing to examples of "similarly situated employee[s] [being] treated differently." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003). Namely, they claim, Whole Foods enforced its dress code selectively, as enforcement was lax before the BLM masks. Our examination of the record, however, reveals no more convincing examples of selective enforcement than those we already rejected in Frith. As we explained there, the plaintiffs had not alleged that "instances of non-enforcement occurred after Whole Foods began generally enforcing the policy around June 2020." 38 F.4th at 274. Evans and Michno still have not done so. They both recount examples of dress code violations going unchecked prior to their protected conduct, but they muster no concrete examples of other employees violating the dress code without being disciplined at the same time that Evans and Michno were being punished for dress code violations. To the contrary, Evans testified that her store imposed a general "crack down" on dress code violations, and regional executives overseeing Michno's store issued a directive to "rein . . . in" the dress code, both apparent efforts to improve

the consistency of dress-code enforcement and thereby show that Evans and Michno were not being singled out.

As we explained in Frith, the argument that "Whole Foods only began enforcing the dress code policy after its employees began wearing the [BLM] masks" did not establish discriminatory animus, as it was "logical that Whole Foods would have a different perspective on enforcing its dress code policy in the era of employee mask-wearing," in which "employees [could] easily and in a highly visible fashion display non-company messages at work." Id. at 275. The "suspicious timing," id., about which Evans and Michno once again complain, is no more suggestive of retaliation here than it was of discrimination in Frith.

At bottom, Evans and Michno, unlike Kinzer, point to nothing in the record suggesting that Whole Foods' discipline of them deviated from the company's normal disciplinary standards. Unable to establish that Whole Foods' "justification is questionable or unworthy of belief," Resare v. Raytheon Co., 981 F.2d 32, 42 (1st Cir. 1992), they have failed to satisfy our instruction in Frith to show that Whole Foods' supposedly "retaliatory discipline was distinguishable from the preexisting and ongoing discipline of employees simply for wearing the Black Lives Matter masks," 38 F.4th at 277. Evans and Michno have thus not shown that a reasonable jury could disregard as pretext Whole Foods' nonretaliatory explanation for their firings. Accordingly,

we affirm the district court's grant of summary judgment against
them.

### III.

Having revived Kinzer's retaliation claim, we must now
turn to the discovery dispute.

### A. Background

During discovery, Whole Foods sought the production of
group chat messages between Kinzer and her coworkers in which
Kinzer provided case updates and also organized her coworkers to
oppose the company's enforcement of the dress code against BLM
masks.  The Employees resisted that request, arguing that the group
chat involved "concerted activit[y]" protected by the National
Labor Relations Act ("NLRA"), 29 U.S.C. § 157, creating a
confidentiality interest in the communications that the district
court must consider when ruling on that discovery request.  The
Employees' concern was directed primarily at the confidentiality
interests of Kinzer's coworkers, some of whom still worked at Whole
Foods and thus feared that if the company obtained a record of
their involvement in opposing Whole Foods' policy, the company
would retaliate against them.

The Employees pointed out that the NLRB has found that
an employer's discovery-related conduct directed at information
related to activity protected by the NLRA can violate the Act.
See Guess?, Inc., 339 N.L.R.B. 432, 435 (2003) (concluding that an

employer's deposition question about names of employees who attended union meetings violated the Act). And the Employees -- as well as the NLRB as amicus in this appeal -- further argued that district courts should consider such legally-recognized confidentiality interests when making discovery-related rulings. See, e.g., Va. Dep't of Corr. v. Jordan, 921 F.3d 180, 192 (4th Cir. 2019) (district court properly considered state-law confidentiality interest in quashing subpoena); Cazorla v. Koch Foods of Miss., L.L.C., 838 F.3d 540, 562-64 (5th Cir. 2016) (district court abused its discretion in failing to consider third-party and public interests in ordering production of information related to plaintiffs' immigration status).

Despite these arguments, the district court ordered the Employees to comply with Whole Foods' discovery request. In doing so, the court reasoned that because other district courts had similarly rejected the existence of a "concerted activity . . . privilege[]," it need not consider whether Whole Foods' discovery request infringed upon the confidentiality of the third-party employees.

The Employees entered a notice of appeal regarding the discovery order, seeking our immediate review under the collateral order doctrine. They also complied with the district court's order, however, redacting names and identifying information and designating the materials as "highly confidential," which, under

the protective order governing the litigation, meant that only Whole Foods' outside counsel could view the messages, even in redacted form.[19]

The Employees urge us to hold that the district court abused its discretion.  In addition to resisting the Employees' arguments on the merits, Whole Foods has consistently challenged our jurisdiction over the appeal of the discovery order, both when the Employees sought our interlocutory review and now on appeal of the summary judgment order.[20]

## B.  Jurisdiction of the Discovery Order under the Collateral Order Doctrine

Before we consolidated the two appeals, the parties disputed whether the Employees' effort to obtain review of the discovery order pursuant to an interlocutory appeal under the collateral order doctrine was mooted by the entry of final judgment.  Compare Strahan v. Mass. Exec. Off. of Energy & Env't Affs., No. 21-1154, 2022 WL 3712302, at *1 (1st Cir. May 6, 2022) (dismissing interlocutory appeal "as moot in view of the district

---

[19]  The district court later overturned that designation, giving Whole Foods access to the redacted messages.

[20]  When the Employees noticed their interlocutory appeal, we ordered them to show cause for why we should not dismiss the appeal for lack of appellate jurisdiction, an issue which the parties subsequently briefed.  We consolidated the two appeals upon the court's entry of summary judgment, instructing the parties to "address finality and all other relevant jurisdictional issues in briefing" this appeal.

court's entry of final judgment") with Luo v. Wang, 71 F.4th 1289, 1291 n.2 (10th Cir. 2023) (exercising jurisdiction over appeal of interlocutory order under the collateral order doctrine despite district court's intervening entry of final judgment). "[W]e need not concern ourselves with [this] fine point of appellate jurisdiction," however. Posada v. Cultural Care, Inc., 66 F.4th 348, 363 (1st Cir. 2023) (finding appellate jurisdiction lacking on other grounds). That is because, despite our instruction that the parties address in their briefing the issue of whether we still had jurisdiction to review the discovery order as a non-final collateral order, the Employees have made no such effort, directing their jurisdictional arguments solely at the appeal from summary judgment.

Our case law makes clear that discovery orders are not normally reviewable as collateral orders. See, e.g., Bennett v. City of Bos., 54 F.3d 18, 20 (1st Cir. 1995). In the absence of any briefing, the Employees have offered no reason to depart from our usual rule, and, indeed, seem to have abandoned any such effort. Hence, we have no basis to separately review the discovery order under the collateral order doctrine in this case, even if the Employees were correct when they initially contended that the district court's entry of summary judgment did not, in and of itself, prevent review of the discovery order as a collateral order.

**C.  Appeal from Final Judgment**

We, of course, have jurisdiction to review non-final orders that have merged into a final judgment.  See Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC, 994 F.3d 77, 82 (1st Cir. 2021) ("Once a district court enters final judgment . . . antecedent interlocutory orders typically merge into the judgment and become subject to appellate review.").  The Employees, however, do not attack the court's discovery order on the ground that it contributed to the court's erroneous grant of summary judgment.  Indeed, the court's summary judgment order did not even reference, nor does it appear to have been informed by, any material disclosed in the messages.

Instead, the Employees urge us to review the discovery order at this juncture because, the genie out of the bottle, it is possible that the erroneous discovery order may infect the trial proceedings to come.  Our review of the discovery order premised on this speculation about a future trial order would be premature.  Ordinarily, "[w]e are . . . disinclined to address . . . matters in the abstract, on the basis of speculative scenarios about what may or may not transpire at trial."  In re Vázquez-Botet, 464 F.3d 54, 59 (1st Cir. 2006) (per curiam) (declining to exercise mandamus review premised on testimony that "conceivabl[y]" would not transpire at trial).  After all, "we have emphasized that a 'claim is not ripe for adjudication if it rests upon contingent future

events that may not occur as anticipated, or indeed may not occur at all.'" Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016) (quoting City of Fall River v. FERC, 507 F.3d 1, 6 (1st Cir. 2007)).

To be sure, when remanding a case to the district court we sometimes find it necessary to give additional "guidance" regarding issues "that are likely to resurface" at trial, assuming those issues were properly presented to us on appeal. United States v. Gonzalez-Maldonado, 115 F.3d 9, 13 (1st Cir. 1997). Here, however, the Employees have made no showing that their concerns regarding the discovery order are likely to recur, particularly since the district court did not rely on the material disclosed in the messages at all.

For now, hence, we think that prudence dictates that "it [is] advisable to await an end-of-case appeal, should one ensue." Vázquez-Botet, 464 F.3d at 59. If Kinzer does lose at trial due to evidence disclosed by the disputed discovery order, she will have the chance for appellate review of the order at that time. In the meantime, she remains empowered to ask the district court for further redactions or to limit the use of the messages at trial.

**IV.**

In light of the foregoing analysis, we vacate the district court's grant of summary judgment for Whole Foods as to

Kinzer's retaliation claim.  We affirm, however, the district court's grant of summary judgment for Whole Foods as to Evans and Michno.  We dismiss appeal No. 22-1064 for lack of appellate jurisdiction.  We remand this matter to the district court for further proceedings consistent with this opinion. Costs are awarded to appellant Kinzer, and all other parties shall bear their own costs.

       So ordered.